```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA

                          Alexandria Division

UNITED STATES OF AMERICA,      )
                               )
     Plaintiff,                )
                               )
                               )
          v.                   )    1:08cv345 (JCC)
                               )
EIGHTEENTH CENTURY PERUVIAN    )
OIL ON CANVAS PAINTING OF THE  )
"DOBLE TRINIDAD" OR            )
"SAGRADA FAMILIA CON ESPIRITU  )
SANTO Y DIOS PADRE",           )
                               )
          and                  )
                               )
SEVENTEENTH CENTURY PERUVIAN   )
OIL ON CANVAS PAINTING OF      )
"SAN ANTONIO DE PADUA" AND     )
"SANTA ROSA DE LIMA",          )
                               )
     Defendants.               )
```

### **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on the Government's Motion for Summary Judgment.  For the following reasons, the Court will grant the motion.

### **I. Background**

The undisputed facts are as follows.  In the late summer or early fall of 2005, Exipion Ernesto Ortiz-Espinoza ("Claimant"), a citizen of Bolivia, brought two paintings into the United States from Bolivia.  The paintings include the eighteenth century oil on canvas painting known as "Doble

1

Trinidad" or "Sagrada Familia con Espiritu Santo y Dios Padre" ("Holy Family") and the seventeenth century oil on canvas painting known as either "San Antonio de Padua" or "Santa Rosa de Lima" ("Saint Anthony") (collectively, the "Defendant Paintings").  Claimant brought the Defendant Paintings into the United States via Miami International and Reagan Washington National Airports.  For transport, the Defendant Paintings were cut from their frames, rolled up, and packed in cardboard cylinders.

Claimant gave the Defendant Paintings to Hugo Joaquin Borda ("Borda") to take to an art gallery.  Borda took the paintings to St. Luke's Gallery in Washington, D.C. ("St. Luke's"), where Borda was informed that the Defendant Paintings needed to be restored.  Borda agreed to the restoration, which took place over a period of seven months at a cost of $3,910.  After the restoration, St. Luke's retained the paintings to sell on consignment. As a prerequisite to sale, St. Luke's asked Claimant to document his ownership of the Defendant Paintings.  Claimant submitted a letter describing the paintings and how he had acquired them, stating that they were of the Cuzco School and that they originated in Alto Peru (now Bolivia).  He was unable, however, to provide official documentation.

St. Luke's then sent the paintings to William Garrett Hodges ("Hodges"), an art dealer and Peruvian art expert in

2

Providence Forge, Virginia.  Hodges observed that the Defendant Paintings are representative of the Cuzco School of Art and had been crudely cut from their frames.  He concluded that the Defendant Paintings might be stolen and contacted the FBI.

In February 2007, the FBI sent digital images of the Defendant Paintings to the National Institute of Culture, Directorate of Historical Patrimony Defense, in Lima, Peru.  There, art expert Juan Carlos Rodriguez Toledo ("Toledo") concluded that the Defendant Paintings "belong to the Peruvian cultural patrimony" and are "from the colonial artistic production of [Peru]."  Based on Toledo's opinion, the FBI concluded that the Defendant Paintings were subject to forfeiture under the Cultural Property Implementation Act, 19 U.S.C. § 2601 *et seq.* ("CPIA") and seized the paintings at Providence Forge, Virginia on November 1, 2007.  The FBI then had the paintings appraised by the Department of Justice ("DOJ"), which valued them at $26,000 and $38,000, respectively.

Claimant contested the administrative forfeiture of the Defendant Paintings.  The Government filed a Verified *In Rem* Complaint ("Complaint") on April 9, 2008.  The Complaint states one count, for seizure and forfeiture of the Defendant Paintings pursuant to the CPIA, 19 U.S.C. § 2609.  Claimant responded by filing a claim of ownership of the Defendant Paintings, two sworn statements, and two letters.  The Government filed a Motion for

Summary Judgment on December 11, 2008 and an Amended Motion for Summary Judgment on January 9, 2009.  Claimant did not respond to these motions.

On January 14, 2009, Borda, acting through his power of attorney for Claimant, filed a Motion for Continuance.  The Court granted this motion in an order issued on January 15, 2009.  In that document, the Court also ordered the Government to file a proper warning to the *pro se* claimant consistent with the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) for its Amended Motion for Summary Judgment, in accordance with Local Rule 7(K).  The Government did so on January 15, 2009.

The Court held a hearing on this motion on February 3, 2009.  Claimant, *pro se*, was present with an interpreter.  The Government's Amended Motion for Summary Judgment is currently before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A

4

genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quotation omitted). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III. Analysis

    A. CPIA Legal Framework

The CPIA provides for the forfeiture of "[a]ny designated archaeological or ethnological material or article of cultural property . . . imported into the United States in violation of [19 U.S.C. § 2606]." 19 U.S.C. § 2609(a). Section 2606 makes it unlawful to import "[a]ny designated archaeological or ethnological material that is exported (whether or not such exportation is to the United States) from the State Party after the designation of such material under [19 U.S.C. § 2604] . . . unless the State Party issues a certification or other documentation which certifies that such exportation was not in violation of the laws of the State Party." *Id.* at § 2606(a).

Section 2604 provides that, "after any agreement enters into force under [§ 2602] . . . the Secretary, in consultation with the Secretary of State, shall by regulation promulgate . . . a list of the archaeological or ethnological material of the State Party covered by the agreement." *Id.* at § 2604. "[E]ach listing made under this section shall be sufficiently specific and precise to insure that (1) the import restrictions under [§ 2606] are applied only to the archeological and ethnological material covered by the agreement . . .; and (2) fair notice is given to importers and other persons as to what material is subject to such restrictions." *Id.*

A "State Party" is any country that has joined the 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property ("UNESCO Convention"). *Id.* at § 2601(5), (9). Peru and Bolivia are both parties to the UNESCO Convention. 19 C.F.R. § 12.104b.

"Ethnological material" is an object that is "the product of a tribal or nonindustrial society, and [is] important to the cultural heritage of a people because of its distinctive characteristics, comparative rarity, or its contribution to the knowledge of the origins, development, or history of that people." 19 U.S.C. § 2601(2)(ii). Further, "[d]esignated" ethnological material is "ethnological material of the State

Party which is covered by an agreement under [title 19] that enters into force with respect to the United States" and "is listed by regulation under [19 U.S.C. § 2604]."  *Id.* at § 2601(7).

The UNESCO Convention and the 1997 Memorandum of Understanding between the Government of United States of America and the Government of Peru Concerning the Imposition of Import Restrictions on Archaeological Material from the Prehispanic Cultures and Certain Ethnological Material from the Colonial Period of Peru, as well as the 2002 and 2007 Extensions of the Memorandum ("Peru MOU"), are agreements under 19 U.S.C. § 2602. 19 C.F.R. § 12.104g (citing Treasury Decision 97-50).

Treasury Decision 97-50 pertains specifically to these agreements and contains "a complete description of specific items or categories of . . . ethnological material designated by the agreement as coming under the protection of the [CPIA]."  19 C.F.R. § 12.104g.  It includes "[o]bjects that were used for religious evangelism among indigenous peoples." Archaeological and Ethnological Material From Peru, 62 Fed. Reg. 31,713 at 31,720 (Dep't of Treasury, June 11, 1997) (final rule).  It also names a number of "[s]pecific types of objects used for religious evangelism during the Colonial period," including "[p]aintings."[1]

---

[1] Catholic priests provided indigenous and mestizo artists with canvases and reproductions of Western works of art, which the artists then "interpreted" with their own images and other indigenous characteristics.

*Id.* at 31,720-21. The "Colonial period" occurred between 1532 and 1821. *Id.* at 31,713.

In sum, the CPIA makes it illegal to import into the United States a (1) Colonial-era painting (2) produced in Peru (3) by indigenous people, (4) used for religious evangelism among those people, and (5) that is important to the cultural heritage of those people (6) without documentation from Peru certifying that the exportation from Peru (whether or not that export was directly to the United States) did not violate Peruvian law.

    B. <u>Burden of Proof in CPIA Action</u>

In 2001, Congress enacted the Civil Asset Forfeiture Reform Act (CAFRA), 18 U.S.C. § 983. CAFRA placed on the Government the burden of proving, by a preponderance of the evidence, that the disputed property is subject to forfeiture. *Id.* § 983(c)(1). The act applies to "all civil forfeitures under federal law unless the particular forfeiture statute is specifically exempted in 18 U.S.C. § 983(i)(2)." *Deep Sea Fisheries, Inc. v. 144,774 Pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir. 2005); *see also* 18 U.S.C. § 983(i)(1)-(2)(a). Because CAFRA specifically states that a "civil

---

These may include symbolically associating Christian religious figures with indigenous divinities, or rendering the figures with Andean facial characteristics or in traditional Andean costume. In addition, each church, convent, monastery, and town venerated an effigy of its patron or tutelar saint, some of them native to Peru.

Archaeological and Ethnological Material From Peru, 62 Fed. Reg. 31,713 at 31,721 (Dep't of Treasury, June 11, 1997) (final rule).

forfeiture statute" "does not include the Tariff Act of 1930 or any other provision of law codified in title 19," its provisions do not govern actions brought under the CPIA, which is codified in Title 19. *See United States v. An Original Manuscript Dated November 19, 1778*, 1999 WL 97894, at *4 (S.D.N.Y. Feb. 22, 1999).

As CAFRA clearly does not apply here, the Court must look for other burden-of-proof schemes that Congress may have intended to apply to CPIA. The generally-applicable burden-shifting statute in Title 19 provides that, in all forfeiture actions brought against "any . . . merchandise[] or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage . . . the burden of proof shall lie upon [the] claimant." 19 U.S.C. § 1615.

Within CPIA, however, Congress expressly stated that, "[n]otwithstanding the provisions of [19 U.S.C. § 1615], in any forfeiture proceeding brought under [CPIA]" where the property "is claimed by any person, the United States shall establish" that property subject to 19 U.S.C. § 2606 "has been listed by the Secretary in accordance with [19 U.S.C. § 2604]." 19 U.S.C. § 2610(1).

Reading these two provisions together, it thus appears that 19 U.S.C. § 2610 places the initial burden on the Government to show that CPIA applies. After that is accomplished, 19 U.S.C. § 1615 places the burden of proof in the remainder of the action

9

on the claimant.  *See An Original Manuscript Dated November 19, 1778*, 1999 WL 97894, *4 ("Congress plainly directs the court to treat a CPIA forfeiture as any other forfeiture except that the burden of proof is initially on the government, not on the claimant.").

Thus, in a CPIA forfeiture action, the United States bears the initial burden to show that the seized property is listed in accordance with 19 U.S.C. § 2604 and properly subject to the import restrictions of 19 U.S.C. § 2606.  Once the Government makes this initial showing, the burden of proof then shifts to Claimant to establish, by a preponderance of the evidence, that the property is not subject to forfeiture, or to establish an applicable affirmative defense.  *United States v. $2,500 in U.S. Currency*, 689 F.2d 10, 12 (2d Cir. 1982), *cert. denied*, 465 U.S. 1099 (1984); *United States v. All Right, Title and Interest in Real Property and Appurtenances Thereto Known as 785 St. Nicholas Ave.*, 983 F.2d 396, 403 (2d Cir.), *cert. denied*, 508 U.S. 913 (1993).  Summary judgment should be granted to the Government if the claimant does not rebut the Government's showing.  *See An Original Manuscript Dated November 19, 1778*, 1999 WL 97894, at *4 (citing United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, N.Y., 889 F.2d 1258, 1268 (2d Cir. 1989).

C.   Government's Initial Burden

In this case, to apply the import restrictions set forth in § 2606, the Government has the initial burden to show that the Defendant Paintings are designated ethnological material exported from a State that is a party to the UNESCO Convention and a bilateral agreement with the United States.  *See* 19 U.S.C. §§ 2606, 2604, 2602.  The Court finds that the Government has met this burden.  It has made a prima facie case that the Defendant Paintings are properly subject to forfeiture under the CPIA.

First, Claimant admits that the Defendant Paintings (1) are of the Colonial era (2) were produced by indigenous people, (3) were used for religious evangelism among those people, and (4) are important to the cultural heritage of those people. Pl.'s Mot. for Summ. J., Ex. 7 at 2-3 (Requests for Admissions). Second, the Government submitted reports by three art experts, two of which clearly state the opinion that the Defendant Paintings originated in Peru.

The Government's reports include a letter from Toledo, an art specialist with Peru's National Institute of Culture, Directorate of Historical Patrimony Defense, Office of Recoveries, stating that the Holy Family is of the Cuzco School, Saint Anthony is of the South Andean Mannerist school, and that "we are able to state that the paintings belong to the Peruvian cultural patrimony."  Pl.'s Mot. for Summ. J. at Ex. 3(B).  *See also id.* at Ex. 5 and 6.  The Government also submitted an

11

appraisal by Judith Benderson ("Benderson"), an attorney with the Department of Justice, Executive Office of the United States Attorney. The appraisal states that the Defendant Paintings are of the Cuzco school of painting, which began in the Incan town of Cuzco in south-central Peru. *Id.* at Ex. 3(C). Finally, a report by Dr. Carol Damian (Damian), Professor of Art and Art History at Florida International University, states his opinion that "these are authentic Colonial paintings from the Andean region (now Peru) and constitute national patrimony and should be returned." *Id.*

Finally, while he declined to admit that he imported the Defendant Paintings without a certification from Peru that their export was lawful under Peruvian law, Pl.'s Mot. for Summ. J., Ex. 7 at 4 (Requests for Admissions), Claimant did not dispute the Government's assertion, in the pending motion, that this certification was missing. In addition, in response to the Court's queries, Claimant repeatedly stated that he possessed no official documentation pertaining to the Defendant Paintings. Hr'g Tr. at 13.

    D.    <u>Claimant's Burden of Rebuttal</u>

As the Government has satisfied its initial burden, the Court turns to the question of whether Claimant has rebutted this showing. Claimant asserts that he is the rightful owner of the Defendant Paintings. His main argument in support of this is

12

that the Defendant Paintings are from Bolivia, rather than Peru.[2] Pl.'s Mot. for Summ. J., Ex. 7 at 3-4 (Requests for Admissions).

### 1. *Documents from the Republic of Bolivia*

To support this argument, Claimant submitted a certificate from the Republic of Bolivia, Ministry of Education and Cultures (Bolivian Certificate). The Bolivian Certificate states that the Defendant Paintings have not been reported as stolen, that they "correspond to the Bolivian artistic heritage," and that they "belong to the private collection of [Claimant]," who took them to the United States for restoration. Pl.'s Ltr. to Ct., Ex. 4-5 [8].

Prior to the hearing on this matter, the Republic of Bolivia, through counsel, submitted a letter stating that (1) Claimant is a citizen of Bolivia, (2) the Defendant Paintings originated in Bolivia, and (3) the Defendant Paintings were exported illegally from Bolivia and should be subject to forfeiture under CPIA.

The letter notes that Bolivia is a party to the UNESCO Convention as of January 4, 1977, 19 C.F.R. § 12.104b, and a 2001 Memorandum of Understanding between the Government of the United

---

[2] Claimant failed to file any response to the Government's Motion for Summary Judgment, leaving the Government's arguments, affidavits, and documentary evidence uncontradicted. Because Claimant is a *pro se* party whose submissions are entitled to a more liberal construction than those drafted by an attorney, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), however, the Court will consider all of the affidavits and letters that Claimant has submitted in this proceeding as though he filed them in opposition to the pending motion.

13

States of America and the Government of Bolivia Concerning the Imposition of Import Restrictions on Archaeological and Ethnological Materials from Bolivia, as well as the 2006 Extension of the Memorandum ("Bolivia MOU").  Both of these agreements qualify as agreements under 19 U.S.C. § 2602.  19 C.F.R. § 12.104g (citing Treasury Decision 01-86).

Treasury Decision 01-86 pertains specifically to these agreements and contains "a complete description of specific items or categories of . . . ethnological material designated by the agreement as coming under the protection of the [CPIA]."  19 C.F.R. § 12.104g.  It "encompasses artifacts produced for use in Catholic religious observance."  Colonial and Republican Religious Art - Oil Painting and Reliquaries, 66 Fed. Reg. 63,490 (Dep't of Treasury, Dec. 7, 2001) (final rule).  It also covers oil paintings that "[i]nclude depictions of patron saints, angels, Christ, the Virgin Mary, the apostles, and the Holy Family on wood, metal, canvas, and other cloth."  *Id.*  Finally, it notes that "[e]thnological materials date from A.D. 1533 to 1900."  *Id.*

It thus appears to the Court that, even if it were to accept Claimant's assertion that the Defendant Paintings originated in Bolivia, they would still be subject to forfeiture if he imported them to the United States without the proper

documentation from that country.[3]  *See* 19 U.S.C. § 2606.  Thus, the debate over whether the Defendant Paintings originated in Bolivia, rather than Peru, does not create a dispute between the parties as to any material fact.

                2.    *Claimant's Failure to Rebut the Government's Prima Facie Case*

The Government also argues that the apparent dispute over the Defendant Paintings' country of origin does not create a genuine issue of material fact regarding whether Claimant exported the Defendant Paintings in violation of CPIA.  The Government asserts that Claimant has not submitted sufficient evidence to meet his burden to rebut the Government's prima facie case.

The Court finds that the majority of Claimant's submissions are simply self-serving affidavits and letters asserting that he is the rightful owner of the Defendant Paintings, explaining how he came to acquire the paintings, and stating that the Defendant Paintings have not been stolen.  Such evidence, if unsupported, carries little weight in forfeiture proceedings.  *See United States v. Approximately $16,943.00 in U.S. Currency*, 2006 WL 2794312, at *9 (E.D. Wis. 2006) (finding

---

[3] As noted above, Claimant repeatedly stated that he possessed no official documentation pertaining to the Defendant Paintings.  Hr'g Tr. at 13.  The Republic of Bolivia has also specifically represented to the Court that the exportation of the Defendant Paintings was illegal under its laws.

that claimant's "self-serving" affidavit regarding his ownership of the money was "without factual support in the record" and would not defeat summary judgment); *United States v. $4,629.00 in U.S. Currency*, 359 F. Supp. 2d 504, 509-10 (W.D. Va. 2005) (holding that claimant's affidavit was insufficient to put the origin of the money in dispute in light of the government's evidence that claimant obtained it by selling drugs); *United States v. $20,000 in U.S. Currency*, 2004 WL 86369, at *2 (D. Minn. 2004) (finding that claimant's documentary evidence did not create a genuine issue of material fact because claimant did not explain where the evidence came from or what its significance was to the seized amount). Further, in only one of these documents, filed on June 2, 2008, does Claimant actually assert that the Defendant Paintings "come from Bolivia." Claimant's assertions regarding the origin of the Defendant Paintings are unsupported and inadequate to defeat summary judgment.

     The Court also notes that, at the hearing, Claimant stated that he would be satisfied by a decision by this Court granting summary judgment in the Government's favor. Such action would allow the relevant office of the DOJ to conduct an investigation to determine the future of the forfeited Defendant Paintings. The Government represented that all interested parties, including Peru, Bolivia, and the Claimant, could apply to the DOJ for possession of the paintings after Claimant

16

forfeits them to the Government.  The Government also represented that it would provide Claimant with notice of these proceedings.

For these reasons, the Court finds that there is no dispute of material fact regarding the allegation that the Defendant Paintings are designated ethnological material exported from a State that is a party to the UNESCO Convention and a bilateral agreement with the United States to apply the import restrictions set forth in § 2606.  *See* 19 U.S.C. §§ 2606, 2604, 2602.  There is also no dispute that Claimant exported the Defendant Paintings from their country of origin without the documentation required by 19 U.S.C. § 2606(a).  Therefore, the Defendant Paintings were "imported into the United States in violation of [19 U.S.C. § 2606]" and are thus subject to forfeiture under the CPIA.  19 U.S.C. § 2609(a).

## IV.  Conclusion

For these reasons, the Court will grant the Government's Motion for Summary Judgment.

An appropriate Order will issue.

February 12, 2009　　　　　_____/s/_____
Alexandria, Virginia　　　　　　　　James C. Cacheris
　　　　　　　　　　　　　UNITED STATES DISTRICT COURT JUDGE